**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

**IN RE**

**OGGUSA, INC., et al.**                                              **CASE NO. 20-50133**

**DEBTOR**

**OGGUSA, INC., ET AL.**                                              **PLAINTIFFS**

**V.**                                                                **ADV. NO. 20-5034**

**SOUTHERN TIER HEMP, LLC**                                           **DEFENDANT**


**MEMORANDUM OPINION
AND ORDER**

The Plaintiffs OGGUSA, Inc., OGG, Inc., and GenCanna Acquisition Corp. are pursuing certain contractual and equitable claims against the Defendant Southern Tier Hemp, LLC.  [ECF Nos. 1, 34.]  Southern Tier filed a Motion to Determine Adversary Proceeding as "Non-Core" pursuant to 28 U.S.C. § 157(b)(3).  [ECF No. 10.]  It also filed a related Motion to Dismiss under Civil Rule 12 (incorporated by Bankruptcy Rule 7012) arguing the Bankruptcy Court lacks subject matter jurisdiction and the Plaintiffs have failed to state claims upon which relief can be granted.  [ECF No. 11.]  The Motion to Dismiss alternatively requests permissive abstention and a change in venue of certain counts.  [*Id*.]  Southern Tier also seeks a stay while it pursues withdrawal of the reference in the District Court.  [ECF No. 16.]

The Plaintiffs object to Southern Tier's Motions.  [ECF Nos. 35, 36, 37, 47.]  Arguments were heard on February 18, 2021, and the matter was submitted.  [ECF Nos. 42-44.]

The Bankruptcy Court has subject matter jurisdiction, and there is Article III and Civil Rule 17 standing.  Count 1 is dismissed, but the Plaintiffs have adequately pleaded Counts 2-11.

1

The remaining counts are non-core state law claims, so the District Court must review any findings of fact and conclusions of law. Southern Tier's requests for permissive abstention, stay of the proceedings and venue transfer are rejected.

## I.    Facts.

### A.  The Bankruptcy Proceeding.

On January 24, 2020, three petitioning creditors filed an involuntary chapter 11 petition against OGGUSA, Inc., then known as GenCanna Global USA, Inc. ("OGGUSA"). [Case No. 20-50133, ECF No. 1.] OGGUSA consented to the involuntary petition on February 6, 2020. [*Id*., ECF No. 37.] An order for relief was entered the same day. [*Id*., ECF No. 94.]

On February 5, 2020, OGGUSA's parent company, GenCanna Global, Inc., the prior name of OGG, Inc. ("OGG", and together with OGGUSA, the "Plaintiff Debtors"),[1] and one of its wholly owned subsidiaries, Hemp Kentucky LLC, filed voluntary chapter 11 petitions. The Debtors' cases were jointly administered. [*Id*., ECF No. 89.]

### B.  The DIP Facility.

MGG Investment Group, L.P. ("MGG"), the agent for the Debtors' primary prepetition secured lenders, established an interim debtor-in-possession financing facility that was approved on February 6, 2020 ("DIP Facility"). [*Id*., ECF No. 82.] The Unsecured Creditors Committee, among others, objected to final approval of the DIP Facility. [*Id*., ECF No. 224.]

The parties attempted to negotiate a final order, but they were unsuccessful. A final order was entered after an evidentiary hearing and subsequent negotiations among the parties. [*Id*., ECF No. 474.] The final DIP Facility order authorized a senior secured superpriority lien on all

---

[1] The Plaintiffs initially referred to OGG and OGGUSA collectively as "Old GenCanna." [ECF No. 34 at 1.] But the term does not always appear consistent in the pleadings and briefing. This Opinion refers to the applicable entity based on the claims and documents involved.

the Debtors' assets except commercial tort claims, claims against the Debtors' officers and directors, and any claims under Chapter 5 of the Bankruptcy Code. [*Id*.]  It also established deadlines for the Committee to challenge liens on, and claims related to, MGG's senior prepetition financing and for the Debtors to take action to coordinate an asset sale or reorganization.  [*Id*.]

Pursuant to the deadlines, the Debtors moved for an order establishing bidding procedures for a sale of substantially all their assets pursuant to 11 U.S.C. § 363(f).  [*Id*., ECF No. 136.]  The bidding procedures motion was subsequently approved on March 6, 2020.  [*Id*., ECF No. 304.]

### C.  The Sale.

On April 27, 2020, the Debtors provided notice that they had accepted a bid from an entity wholly owned by funds and accounts managed by MGG.  [*Id*., ECF No. 682.]  The named purchaser was Plaintiff GenCanna Acquisition Corporation ("GAC").

The Committee and several other creditors objected to the Sale.  [*Id*., ECF No. 690.]  The Committee also filed a request for standing and authority to prosecute its claims against MGG. [*Id*., ECF No. 717.]

An evidentiary hearing was held on May 6-7, 2020.  [*Id*., ECF Nos. 812-815.]  While the hearing was ongoing, the Debtors, MGG, GAC, and the Committee continued to work diligently toward a consensual sale order and global resolution of their disputes.  The parties reported on the final day of the hearing that they had generally reached some settlement terms that would require MGG to contribute additional assets to the Debtors' estate.  But the parties needed additional time to negotiate and document the terms, so they were unable to present a consensual

sale order prior to the conclusion of the hearing.  [*Id.*, ECF No. 815; ECF No. 982 at pp. 5-6, 191-192.]

The Sale was ultimately approved over the objections, based in part on the concessions by MGG, and in anticipation of the developing settlement negotiations.  [*Id.*, ECF No. 814 at 1:05:24; ECF No. 982 at pp. 195-197.]  An order approving the Sale was entered on May 19, 2020.  [*Id.*, ECF No. 850.]  The Sale closed on May 29, 2020.  [*Id.*, ECF No. 889.]

**D.  The MGG Settlement and Chapter 11 Plan.**

As instructed at the Sale hearing, the parties continued to negotiate a global settlement in support of a consensual plan.  The Debtors initially proposed a compromise with MGG and GAC on July 30, 2020.  [*Id.*, ECF No. 1145, Ex. A ("MGG Settlement").]  Under the terms of the proposed settlement, MGG agreed to pay $1 million in cash to the Debtors' estate.  The prepetition lenders would have an allowed secured claim of approximately $27 million, which they would subordinate to the rights of the other unsecured creditors.  [*Id.* at §§ 2-4.]  GAC also agreed to share the proceeds of litigation related to claims arising from certain assets, including claims against Michael Falcone and Southern Tier.  [*Id.* at § 5(a).]

A week later, the Debtors filed a proposed disclosure statement and liquidating plan that incorporated the MGG Settlement.  [*Id.*, ECF No. 1163 (plan), ECF No. 1164 (disclosure statement).]  The Committee also filed a Motion to Convert Pursuant to 11 U.S.C. § 1112.  [*Id.*, ECF No. 1161.]  Later comments confirmed the Committee continued to negotiate a resolution of all issues, but it still was not satisfied with its level of participation and the terms of the settlement.  Eventually, multiple parties filed written objections to the MGG Settlement and initial reorganization plan and disclosure statement. [*Id.,* ECF Nos. 1187, 1196, 1199, 1200, 1202, 1219, 1230.]

The Debtors, MGG, GAC, and the Committee were ordered to mediate the settlement disputes, conversion request, authority to prosecute claims, and ancillary issues before Hon. Tracey N. Wise.  [*Id*., ECF Nos. 1285, 1287.]  The September mediation lasted weeks and was ultimately successful, resulting in amendments to the relevant documents in early October.  [*Id*., ECF Nos. 1405, 1407, 1496.]

Parties that claimed to hold an equity interest in OGG and a creditor interest in OGGUSA, referred to as the Marimed Parties, still objected to the reorganization plan and the MGG Settlement.  The Debtors filed their Second Amended Joint Plan of Liquidation prior to the confirmation hearing scheduled in early November to set out the final concessions of the Debtors, MGG, GAC, and the Committee.  [*Id.*, ECF No. 1497 (hereafter, the "Plan").]  On the eve of the confirmation hearing, the Debtors, MGG, GAC, and the Committee resolved the disputes with the Marimed Parties.  The Marimed Parties agreed to withdraw their objections and vote in favor of the Plan in exchange for an allowed claim.  [*Id.*, ECF No. 1516.]

The resolution with the Marimed Parties cleared the final hurdle for approval of the MGG Settlement on November 10, 2020, and the consensual confirmation of the Plan on November 11, 2020.  [*Id*., ECF Nos. 1511, 1517.]

**E.  The Adversary Proceeding**.

October 14, 2020, the Plaintiffs jointly filed this adversary proceeding.  [ECF No. 1.] The Plaintiffs allege that Falcone, as the chair of the Plaintiff Debtors' board of directors, used Plaintiff Debtors' money to operate his side-business, Southern Tier, and that Southern Tier breached its oral and written promises to compensate the Plaintiff Debtors.  [ECF No. 1 at ¶¶ 1-4.]

The Plaintiffs' claims are based on the following:

1. **The September 2018 Note**. That certain Promissory Grid Note dated September 17, 2018, made by Southern Tier payable to OGGUSA in the face principal amount of $750,000.00. [*Id.* at ¶¶ 13-14, Ex. A.]

2. **The Hemp Field Grower Agreement**. An oral agreement made by Southern Tier to compensate OGG for the obligations incurred under that certain Hemp Field Grower Agreement dated April 1, 2019, by and between OGG and Lake Breeze Farms, LLC, under which OGG agreed to pay Lake Breeze to plant, grow, and cultivate industrial hemp for the benefit of Southern Tier. [*Id.* at ¶¶ 15-19, Ex. B.]

3. **The Nanticoke Notes**. Obligations arising when OGGUSA satisfied the maker's obligations under the following:
   a. **Nanticoke Note I**. That certain Note dated July 3, 2019, made by Southern Tier payable to NG Growers, Inc., d/b/a Nanticoke Gardens ("Nanticoke"), and guaranteed by OGGUSA, in the face principal amount of $756,604.80, which Promissory Note was replaced and superseded by the Amended & Restated Note dated August 12, 2019, made by Southern Tier payable to Nanticoke, and guaranteed by OGGUSA, in the face principal amount of $790,041.60. [*Id.* at ¶¶ 22-23, 26-28, Exhs. C & E.]
   b. **Nanticoke Note II**. A Promissory Note dated July 3, 2019, made by Southern Tier payable to Nanticoke, and guaranteed by OGGUSA, in the face principal amount of $705,889.60. [*Id.* at ¶¶ 24-25, 28, Ex. D.]

4. **The Products**. A promise by Southern Tier to reimburse OGG and OGGUSA for a total of $228,192.00 in hemp cuttings, genetics, mother plants, seeds, hemp, and CBD products. [*Id.* at ¶¶ 29-30.]

The Plaintiff Debtors and GAC jointly request turnover of any funds due from Southern Tier related to these agreements pursuant to § 542 (Count 1). They also jointly seek damages against Southern Tier for breach of contract (Counts 8, 9, and 10), unjust enrichment (Count 3), and promissory estoppel (Count 11) related to the same obligations. OGGUSA has alleged breach of contract under the September 2018 Note[2] (Count 2) and seeks recovery from Southern

---

[2] Count 2 of the Amended Complaint alleges that the breach of contract claim under the September 2018 Note is brought by OGG against Southern Tier. [ECF No. 34 at ¶¶ 57-64.] Other parts of the Amended Complaint confirm, however, that this note is made by OGGUSA payable to Southern Tier. [*See, e.g., id.* at ¶¶ 13-14 and Ex. A.]

Tier based on theories of indemnification (Counts 4 and 5) and subrogation (Counts 6 and 7) related to the Nanticoke Notes.

Southern Tier moved to declare the proceeding non-core in anticipation of filing a motion to withdraw the reference with the District Court.  [ECF No. 10.]  It also requested a stay of the proceeding pending a ruling on withdrawal of the reference.  [ECF No. 16.]  Southern Tier further moved to dismiss the complaint pursuant to Civil Rules 12(b)(1) and 12(b)(6).  It alternatively asks the Court to permissively abstain from hearing the proceeding under 28 U.S.C. § 1334 or to transfer the claims related to the Nanticoke Notes to the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 1404(a).  [ECF No. 11.]

The Plaintiffs were granted leave to amend the original Complaint [ECF No. 33], and an Amended Complaint was filed on February 2, 2021 [ECF No. 34].  The Plaintiffs' allegations and claims in the Amended Complaint are substantially the same as the original Complaint.  The only changes are amendments to the factual allegations that: (1) GAC acquired the rights to only the "proceeds for the note receivables and other receivables" in the Sale; (2) the Plaintiff Debtors and GAC agreed to share in the proceeds of litigation against Southern Tier pursuant to the MGG Settlement; and (3) the Plaintiffs sent a third demand letter to Southern Tier on January 11, 2021. [*Id*. at ¶¶ 37, 42-44.]  Southern Tier moved to dismiss the Amended Complaint and incorporated its prior arguments by reference.  [ECF No. 41.]  Southern Tier's requests for relief are considered based on the allegations and claims in the Amended Complaint.

II.     **Discussion.**

    **A.  The Bankruptcy Court Has Subject Matter Jurisdiction.**

        **1.  Jurisdiction Depends on Whether the Proceeding is "Related To" the Bankruptcy.**

Congress granted district courts original and exclusive jurisdiction over "all cases under title 11." 28 U.S.C. § 1334(a).  District courts also have original, but not exclusive, jurisdiction over all civil proceedings: (1) "arising under" title 11; (2) "arising in" a case under title 11; or (3) "related to" a case under title 11.  28 U.S.C. § 1334(b).  Consistent with 28 U.S.C. § 157(a), the United States District Court for the Eastern District of Kentucky has referred all such cases, with some exceptions not applicable here, to the Bankruptcy Court.  JOINT KY. CIV. PRAC. R. 83.12.

In deciding whether a bankruptcy court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and § 157(b), it is only necessary to decide whether the matter is "related to" the bankruptcy. *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1141 (6th Cir. 1991).  This depends on whether "the outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Id.* at 1142 (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).  "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.*

Southern Tier argues jurisdiction over the claims disappeared when the Plaintiff Debtors' assets were sold to GAC in May.  Southern Tier also uses the Sale to leap to the conclusion that resolution of the proceeding will have no conceivable effect on the bankruptcy estate.

Southern Tier's characterization of the Sale is too limited.  The Plaintiff Debtors transferred control of assets, but they maintained limited rights in the recovery for the claims

addressed in the Amended Complaint.  The rights they retained preserved continuing Bankruptcy

Court jurisdiction.

### 2. The Plaintiff Debtors' Estate Maintained a Sufficient Interest in the Obligations in the Amended Complaint to Exercise Jurisdiction.

#### a. The Reorganization Process Was Ongoing.

Southern Tier focuses too much on a single point in time and one document – the Sale as

evidenced by the Asset Purchase Agreement ("APA").  This is an overly limited view that

ignores the continuing evolution of a chapter 11 bankruptcy case – and the Debtors' cases in

particular – from the petition date through confirmation of a reorganization plan.

A perfect chapter 11 case will create a viable entity, preserve jobs, and provide value to

all creditors.  Chapter 11 cases are rarely perfect because there is seldom enough money to go

around.  But a confirmed plan should provide the highest and best return for as many of the

varied interests as possible.  This occurs through negotiation and creative thinking by the parties

involved in the reorganization process from the beginning of the case to confirmation.

The Debtors began their reorganization process in February 2020 and finalized it with

confirmation of their Plan in November 2020.  It was, indeed, a process.  The Debtors were in

constant and continuous (and certainly, at times, contentious) negotiations with MGG, the

Committee, and, after the Sale, GAC, to find a way to reorganize.  The culmination of these

negotiations was a consensual Plan that left the Debtors' estate with an interest in certain assets

to enhance recovery for its creditors, including the obligations referenced in the Amended

Complaint.

#### b. The Sale Was Approved Subject to an Enhancement of the Rights of the Debtors' Estate.

During the Sale hearing in May, the Debtors described the rough parameters of a

settlement with MGG and GAC that would leave assets with the Debtors' estate.  The Committee

did not believe MGG and GAC had given enough, but the Committee, like the Court, understood

MGG and GAC had committed to a floor.  The oral record and transcript of the hearing show the

Sale was specifically approved subject to additional concessions from MGG and GAC.  *See*

*supra* at Part I.C.

The exact nature of the enhancement was in flux at the time the Sale was approved.  But

the record in this case confirms the parties were always working towards a resolution that would

include the recoveries addressed in the Amended Complaint.  This started with the closing

documents executed on May 29, 2020.  [Case No. 20-50133, ECF No. 889.]

One of the closing documents was the Transition Services Agreement ("TSA") which

addressed the tasks the Debtors would continue to perform while the parties carried on their

negotiations and the business was transitioned to GAC.  [*Id.*, Ex. B.]  The TSA anticipated a

delayed transfer of certain assets and assistance with collection activities to facilitate the process.

[*Id.* (*Manage and Transition Transferred Assets* and *Finance* sections of the attached Services

Schedule).]  More directly, the *Legal Services* section of the Services Schedule contemplated

"Legal Proceedings (Pending Disputes)" and recognized the Debtors would remain involved in

instituting, managing, and taking other actions related to the dispute with Southern Tier.  [*Id.* at

p. 21.]

The early record surrounding the Sale shows the Southern Tier claims were not fully

addressed in the Sale and the case-long reorganization process was continuing.

> ### c.   The Debtors' Negotiations Culminated in a Consensual Plan that Relied on the Debtors' Right to Recovery on the Matters Raised in this Proceeding.

The process worked, resulting in an agreed settlement with MGG and GAC and a

consensual plan of reorganization involving the Committee.

The parties were specifically instructed at the Sale hearing to continue to negotiate the settlement terms and seek approval of the agreements reached as part of the confirmation process.  [*Id*., ECF No. 982 at p. 197 ("I [the Court] know we're not done and I expect to have everybody put the same effort into getting this case to some form of conclusion the same way they got it to this [point].")]  Consistent with that expectation, the proposed MGG Settlement was filed in the record in late July, several months before this Adversary Proceeding was filed. [*Id*., ECF No. 1145, Ex. A.]

The MGG Settlement clearly defines the parties' intentions related to the claims in this proceeding.  The MGG Settlement specifically requires cooperation in the collection, recovery, and prosecution of "the obligations owed by Southern Tier … to the Debtors under or related to certain promissory notes and other obligations, together with such other claims as the Debtors have or may have against Mr. Falcone or any affiliate that remain assets of the estate."  [*Id.* at § 5.]  In addition to the direct identification of the target, the Plaintiff Debtors and GAC agreed to prosecute their separate claims against Southern Tier together to promote efficiency "despite the fact that certain of the claims are property of GAC and certain of the claims may be property of the Debtors' estate."  [*Id*. at §§ 5(a), n. 2, 5(h).]

Approval of the MGG Settlement was made a condition precedent to confirmation and consummation of the initial plan and was incorporated therein.  [*Id*., ECF No. 1163 at § IX.A; ECF No. 1164 at § 4.05.1(e).]  The proposed plan provided for transfer of the Debtors' assets, including certain Retained Causes of Action, to a Wind-Down Trust.  [*Id*., ECF No. 1163 at § IV.C.]  The Debtors, MGG, GAC, and the Committee then participated in the mediation before Judge Wise to further enhance the deal.

Additional concessions were made during mediation, and again nearer to confirmation, to obtain a consensual plan. *See infra* at Part II.A.3. The disclosure statements were amended to clarify that the Plan Administrator had the responsibility to administer any "Estate Recoveries" as identified in the MGG Settlement. [*Id*., ECF No. 1414-1 at §§ 3.10 n. 23, 4.03.3; *see also id*., ECF No. 1413 (order approving modifications made following mediation).] A Plan Supplement was filed containing schedules that clearly identified the "Falcone Litigation" as a Retained Cause of Action. [*Id.*, ECF No. 1414-1, Appendix I (defining "Retained Causes of Action" and "Excluded LM Causes of Action"); ECF No. 1453, Exhs. A-5, A-8 (Schedule of Retained Causes of Action).] Ultimately, the Plan was confirmed and the MGG Settlement was a critical component of the resolution of the entire bankruptcy process that provided real value to the Debtors' estate.

The record supports the Plaintiffs' claim that the Plaintiff Debtors never fully relinquished the rights involved in this Adversary Proceeding. This interest is sufficient to fall into the broad interpretation of property of the estate under § 541. *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 508 (Bankr. S.D. Ohio 2021). Subject matter jurisdiction exists.

### 3. The APA Does Not Alter the Bankruptcy Court's Continuing Jurisdiction.

Southern Tier argues that challenges to jurisdiction are decided based on "the state of things at the time of the action brought." *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570-71 (2004) (citing *Mollan v. Torrance*, 9 Wheat, 537, 539, 6 L. Ed. 154 (1824)). The preceding discussion confirms that the state of things prior to October 14, 2020 (the adversary filing date), shows the Plaintiff Debtors had maintained an interest in the obligations addressed in the Amended Complaint.

The information from the May Sale hearing and closing, the MGG Settlement in July, and the initial reorganization plan in early August all evidence this continuing interest.  In September, the mediation resulted in a 4.25% increase in the Debtors' share of the proceeds of any recovery in this litigation.  [*See* Case No. 20-50133, ECF No. 1499-40, Ex. 40 (the Mediation Term Sheet).]  Then, on October 9, 2020, the Debtors filed the amendments to the Plan, Disclosure Statement, and MGG Settlement that continued to evidence the Debtors' claims. [*Id.*, ECF Nos. 1405, 1406, 1407.]

This explains why Southern Tier wants a strict reading of the APA that would terminate the Plaintiff Debtors' rights in the Southern Tier obligations on the May 29 closing date.  [*Id.*, ECF No. 889-1, Ex. A ("APA").]  Focusing solely on the APA to revoke jurisdiction is not appropriate, as the prior discussion confirms.  There is no doubt assets transferred; but the overall record shows the Plaintiff Debtors retained enough of an interest to retain jurisdiction.

The parties focus on Section 2.1(e) of the APA, which provides for transfer of "all accounts receivable (whether billed or unbilled), notes, and other documents which evidence any indebtedness to the Sellers, including (without limitation) as set forth on Schedule 4.15."  [ECF No. 34-7, at § 2.1.]  Schedule 4.15 addresses two categories of obligations: 1) accounts receivable on an attached list that includes the Products receivable; and 2) "Proceeds for the note receivables and other receivables from the following: … Southern Tier Hemp $3,363,964.26 [and] Southern Tier Hemp $750,000.00."   The first total in part 2) substantially equals the claims related to the Nanticoke Notes and the Hemp Field Grower Agreement ($1,805,931 + $1,590,902 = $3,396,833 ($32,869 off)).  The second total references the face amount of the September 2018 Note.

The Plaintiffs assert the words in part 2) on Schedule 4.15 were chosen to reflect the intention that the Debtors would have some rights in the referenced obligations.  There is no other reason to lead in with the description of "Proceeds for the note receivables and other receivables"; the parties to the APA would have just listed the debt.  It does appear the parties intended some qualification in part 2) when the word "proceeds" was added to the executed version of the APA sometime after the draft version was filed.  [*Compare* Case No. 20-50133, ECF No. 762-1 (May 3) *with* ECF No. 889-1 (May 29).]

This corroborates the Plaintiffs' claim that they consciously intended to describe any rights that might exist related to Southern Tier in Section 2.1(e).  The description is not as clear as anyone would like.  But the unusual language and structure is enough to conclude that the parties to the APA intended for the Debtors to retain something.

This is not a situation where the Court must decide a property dispute between a buyer and a seller.  If that were the case, then it is possible the answer might require parol evidence. *L.K. Comstock & Co., Inc. v. Becon Const. Co.*, 932 F. Supp. 948, 964 (E.D. Ky. 1994).  Here, the parties to the agreement are the Plaintiffs and they do not disagree.  Their interpretation does not conflict with the current record in this case and the expectation of an enhancement to the Debtors' estate starting at least at the Sale hearing in early May.

The APA did not sever Bankruptcy Court jurisdiction over the Southern Tier obligations.

### 4.    **There Is No Evidence the Debtors Attempted to Purchase Bankruptcy Court Jurisdiction**.

The record confirms the Debtors, MGG, GAC, and the Committee were working towards a solution that would enhance the recovery for the Debtors' creditors at all relevant times.  Well before this lawsuit was filed, the parties documented a resolution that confirmed part of that enhancement was the creditors' right to share in any recovery involving the Debtors' claims

against Southern Tier.  There is nothing in the run up to the Sale, the MGG Settlement, and the confirmed Plan that suggests an improper motive regarding jurisdiction.

Southern Tier points to *Spradlin v. Williams (In re Alma Energy, LLC)* to accuse the Plaintiff Debtors of an attempt to purchase jurisdiction after transferring the assets involved in the adversary proceeding.  Bankr. No. 07-70370, Adv. No. 09-7005, 2012 WL 243746 (Bankr. E.D. Ky.  Jan. 24, 2012), aff'd *Spradlin v. Pikeville Energy Grp., LLC*, Civil No. 12-111-ART, 2012 WL 6706188 (E.D. Ky. Dec. 26, 2012).  *Spradlin* is not relevant.

In *Spradlin*, a party to an ongoing lawsuit purchased the debtor's claims from the chapter 7 trustee.  The purchaser became the plaintiff and thereafter filed amended complaints in the trustee's name and its own name that "drastically" changed the character of the proceedings.  *Id.* at *11.  Several defendants moved to dismiss arguing the bankruptcy court no longer had subject matter jurisdiction.

The bankruptcy court determined that the drastic changes in the claims no longer involved the debtor; the case had become a dispute between non-debtor parties.  *Id*.  Thus, there was no "related to" jurisdiction.  The plaintiff attempted to argue jurisdiction existed because the debtor's estate had an interest in the outcome of the litigation.  The interest existed because the non-debtor plaintiff had assigned a small portion of the recoverable proceeds back to the chapter 7 trustee after the motion to dismiss was filed.

The bankruptcy court did not accept this argument for two reasons, neither of which applies.  First, the assigned interest held by the chapter 7 estate was "truly miniscule", making any argument there was an effect on the estate too tenuous.  *Id.* at 12.  That is not the case here.  The MGG Settlement was approved as fair and equitable and in the best interests of the estates.

The MGG Settlement was incorporated into the Plan and is a material source of the potential recovery for creditors that paved the way for a consensual confirmation.

The court in *Spradlin* then found that the agreement to give the estate the miniscule recovery was an improper attempt to create jurisdiction through a contract. *Id.* at *11-12. Again, that is not the case here. Disclosure of the sharing arrangement involving the Southern Tier obligations was in the record months before the original Complaint was filed. The discussion throughout this Opinion does not suggest an effort to contract for jurisdiction.

Southern Tier's reliance on *Ilardo v. Al's Diesel, Inc. (In re World Parts, LLC)* is also unavailing. 322 B.R. 37 (Bankr. W.D. N.Y. 2005). In *World Parts*, the chapter 7 trustee sought turnover of inventory after reaching a settlement that gave the estate a small portion of any proceeds from the recovery. The bankruptcy court found there was no jurisdiction because, even if the debtor rightfully owned the inventory, it was sold prepetition and was never property of the debtor's estate. *Id.* at 40-42. Unlike the debtor in *World Parts*, the Debtors had an interest in the claims against Southern Tier at the time the petition was filed, and they retained an interest in those claims following the Sale.

A heavily negotiated chapter 11 plan confirmation process involving multiple claims and numerous parties over many months is not comparable to the after-the-fact attempt to create jurisdiction in *Spradlin* or *World Parts*. "Related to" jurisdiction exists for the claims that are not otherwise dismissed.

### B.  The Plaintiff Debtors Have Standing to Bring the Claims Against Southern Tier.

Southern Tier also argues that the Bankruptcy Court lacks subject matter jurisdiction because the Plaintiff Debtors are not real parties in interest. The Plaintiff Debtors are real parties in interest and have standing to bring the claims against Southern Tier.

### 1. The Plaintiff Debtors Have Article III Standing.

A party seeking relief must have constitutional standing to sue. The constitutional standing requirement arises from Article III, § 2, of the U.S. Constitution, which grants federal courts jurisdiction over "cases" and "controversies." *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002).  Article III standing requires a plaintiff to prove: (1) the plaintiff suffered "an injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there is a causal connection between the injury and the conduct that is traceable to the challenged action; and (3) it is likely, as opposed to speculative, that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).

The facts in the Amended Complaint, taken as true, describe promises by Southern Tier to compensate the Plaintiff Debtors that remain unpaid.  A favorable decision will redress Southern Tier's alleged failure to fulfill its promises.  The Plaintiff Debtors have Article III standing.

### 2. The Plaintiff Debtors Have Standing to Sue Under Civil Rule 17.

The Plaintiff Debtors must also show that they have standing to sue under Civil Rule 17 (incorporated by Bankruptcy Rule 7017).  Civil Rule 17 provides that only the "real party in interest" may prosecute an action. The "real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law." *Certain Interested Underwriters at Lloyd's, London, Eng. v. Layne*, 26 F.3d 39, 42–43 (6th Cir. 1994). The Plaintiff Debtors are entitled to enforce the rights sued upon in the Adversary Proceeding.  *See supra* at Part II.A. The Plaintiff Debtors are therefore real parties in interest entitled to bring the claims asserted by them in the Amended Complaint.

### C. **The Claims in the Adversary Proceeding Are Non-Core**.

The Bankruptcy Court may hear and finally determine core proceedings that are not otherwise constitutionally non-core. 28 U.S.C. § 157(b). The Bankruptcy Court may also hear a non-core proceeding "that is otherwise related to a case under title 11." 28 U.S.C. § 157(c)(1). But the Bankruptcy Court may not enter final judgment for a non-core matter without consent; it may only enter proposed findings of fact and conclusions of law for a de novo review by the District Court. 28 U.S.C. § 157(c)(1) and (2).

Section 157(b)(2) provides a non-exhaustive list of "core proceedings." 28 U.S.C. § 157(b)(2). The Amended Complaint alleges that this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), and (O). [ECF No. 34 at ¶ 6.] Subsection (E) applies to orders to turnover property of the estate. The request for turnover under § 542 in Count 1 is dismissed, *see infra* at Part II.D.2, so there is no core jurisdiction under § 157(b)(2)(E).

Subsections (A) and (O) relate to core proceedings affecting the administration and liquidation of estate property. Recovery under the state law theories raised in the other counts of the Amended Complaint are a part of the assets integral to the MGG Settlement and consensual Plan that were transferred to the Wind-Down Trust at confirmation. Thus, this matter affects administration of the bankruptcy estate and its property.

But the claims are not core under either § 157(b)(2)(A) or (O). A core proceeding invokes a substantive right created by federal bankruptcy law or one which could not exist outside of the bankruptcy. *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 320 (6th Cir. 2006). A core proceeding is also one where the action stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process. *Stern v. Marshall*, 564 U.S. 462, 499 (2011). Neither is the case here.

Southern Tier has not filed a proof of claim in the Debtors' bankruptcy cases, so the claims allowance process is not implicated.  The Plaintiffs' claims for unjust enrichment, indemnification, subrogation, breach of express or implied contract, and promissory estoppel are state law claims that exist outside of the bankruptcy cases.  They do not arise in a title 11 proceeding because they are not based on a right expressly created by title 11.  They do not arise under title 11 because they are not created or determined by a statutory provision in title 11.  *See Wolverine Radio Co.*, 930 F.2d at 1144.

Based on this, the District Court must review any findings of fact and conclusions of law and enter a final decision.  28 U.S.C. § 157(c)(1).

### D. Southern Tier's Motion to Dismiss Under 12(b)(6) is Granted as to Count 1 and Denied as to Counts 2-11.

#### 1. Civil Rule 12(b)(6) Standard.

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to survive a motion to dismiss under Civil Rule 12(b)(6).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  "If it appears beyond doubt that the plaintiff's complaint does not state facts sufficient to 'state a claim that is plausible on its face,' then the claims must be dismissed."  *Preferred Auto. Sales, Inc. v. DCFS USA, LLC*, 625 F. Supp. 2d 459, 462 (E.D. Ky. 2009).

A complaint will survive a motion to dismiss if it "contain[s] either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Moon v. Harrison Piping Supply,* 465 F. 3d 719, 723 (6th Cir. 2006) (quoting *Performance Contracting, Inc. v. Seaboard Sur. Co.*, 163 F. 3d 366, 369 (6th Cir. 1998)).  In evaluating a motion to dismiss, a court may consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and

matters of which a court may take judicial notice.  *Spradlin v. Pryor Cashman LLP* (*In re Licking River Mining, LLC*), 565 B.R. 794, 801 (Bankr. E.D. Ky. 2017).

### 2.    Count 1 – Turnover under 11 U.S.C. § 542(b).

The Plaintiff Debtors and GAC seek turnover of the total amount allegedly due on the obligations related to the September 2018 Note, Hemp Field Grower Agreement, Nanticoke Notes, and for the Products.  GAC may not pursue this relief because turnover is only available to the Debtors.  11 U.S.C. § 542; *see also Int'l Asset Recovery Corp. v. Thomson McKinnon Sec. Inc.*, 335 B.R. 520, 525 (S.D. N.Y. 2005).

Further, a § 542 request for turnover is not appropriate when the debt is a contractual dispute.  *See*, *e.g.*, *U.S. v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes[.]"); *In re Infinity Home Health Care, LLC*, No. 16-10062-J7, 2018 WL 5310659, at *2 (Bankr. D.N.M. Oct. 25, 2018) (holding a party cannot liquidate breach of contract or unjust enrichment claims through a turnover action); *Son v. Coal Equity, Inc. (In re Centennial Coal, Inc.)*, 278 B.R. 54, 58 (Bankr. D. Del. 2002) (holding a cause of action for recovery from unpaid prepetition invoices was a state law contract claim and not a turnover action); *In re Asousa P'ship*, 264 B.R. 376, 384 (Bankr. E.D. Pa. 2001) (The remedy under § 542(b) "cannot be used to determine the rights of parties in legitimate contract disputes.").

Count 1 is a reiteration of the Plaintiffs' state law contract claims in Counts 2-11 restated as an invalid turnover action and is dismissed.

### 3.    Counts 2-11 Are Not Dismissed.

The requests to dismiss Counts 2-11 are denied.  Count 2 was premature to the extent it is predicated on a demand under the September 2018 Note.  But the claim is now ripe, so judicial

economy controls.  The other arguments from Southern Tier for the various counts raise

legitimate questions that suggest the claims might not survive a higher level of scrutiny than that

imposed on a motion to dismiss.  But the allegations, accepted as true, are sufficient to state

plausible claims for recovery.

### E.  This Case Should Proceed in the Bankruptcy Court.

If the litigation continues, Southern Tier asks in the alternative for permissive abstention

or a stay while the District Court decides on a promised request to withdraw the reference.

28 U.S.C. § 1334(c)(1); FED. R. BANKR. P. 5011.  If these arguments do not work, Southern Tier

seeks transfer of venue to New York for the counts related to the Nanticoke Notes.  All requests

are denied.

The facts of this case do not support abstention.  Abstention is based on the facts and

circumstances of each case, but abstention is the exception and not the rule.  *See, e.g., Parker v.*

*Nationwide Mut. Ins. Co. (In re Duran)* 586 B.R. 7, 10–11 (Bankr. N.D. Ohio 2018) (listing 13

factors that would support abstention).   The preceding discussion confirms the outcome of this

adversary proceeding will directly affect the administration of the Debtors' estate.  The state law

issues are not difficult and there are no proceedings in other courts or other factors that might

force abstention.  Further, the matter is easily transferred to the District Court to review findings

of fact and conclusions of law or when this matter is trial-ready.

A stay of the proceedings is likewise unnecessary.  Finalizing the pleadings and

discovery is required in any court.  *See CIT Group/Commercial Servs., Inc. v. Constellation*

*Energy Comm. Group, Inc.* (*In re Black Diamond Min. Co., LLC)*, Case No. 10-84-KKC, 2010

WL 5173271, at *2 (E.D. Ky. Dec. 14, 2010) (an immediate withdrawal of the reference is not

necessary merely because the claims asserted are non-core).   If the matter proceeds to a jury

trial, the District Court will take over.  JOINT KY. CIV. PRAC. R. 83.12; *see also Sergent v.*

*McKinstry*, 472 B.R. 387, 420-21 (E.D. Ky. 2012) (denying motion to withdraw reference as

"premature" notwithstanding movant's right to a jury trial and ordering that the bankruptcy court

conduct all pretrial matters).

The final argument is the request to transfer venue to New York for the counts related to

the Nanticoke Notes based on 28 U.S.C. § 1404(a) and the doctrine of *forum non conveniens*.

The Nanticoke Notes contain forum selection clauses that require:

> all judicial actions or proceedings brought against any party arising out of or
> relating to this note with guaranty, or any obligations hereunder or thereunder,
> shall be brought exclusively in any state or federal court of competent jurisdiction
> in the State of New York, County of Broome, namely the United States District
> Court for the Northern District of New York or New York State Supreme Court
> County of Broome.

[ECF No. 34, Ex. D at p. 4; Ex. E at p. 4.]

A party that stands in the shoes of a lender to enforce a note is generally bound by a

forum selection clause.  *See Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F.Supp.2d 118,

126 (S.D.N.Y. 1997).  This rule only applies, however, when the subrogee's rights derive solely

from the underlying note.  *Id.*  The Plaintiff asserts it is not suing on the Nanticoke Notes:

> With respect to the Nanticoke Notes, Plaintiffs are not suing Defendant *under* the
> Nanticoke Notes in any Count of the Amended Complaint. The Nanticoke Notes
> do not control Plaintiffs' claims. The Nanticoke Notes, as attached to the
> Amended Complaint, are evidence of the origin of some of Defendant's debts and
> obligations to Plaintiffs, but they are not documents that actually give rise to or
> govern Plaintiffs' claims. To the extent any of Counts 2-7, 9, and 11 touch on the
> Nanticoke Notes, the claims arise from Falcone's actions and Defendant's
> separate agreement and promise to pay or reimburse Old GenCanna for debts
> incurred for Defendant's benefit.

[ECF No. 35, ¶ 62.]    Based on this, the forum selection clauses in the Nanticoke Notes do not

control.

**III.      Conclusion.**

Based on the foregoing, it is ORDERED:

(1) Southern Tier's Motion to Determine Adversary Proceeding as "Non-Core" [ECF No. 10] is GRANTED IN PART. The adversary proceeding gives rise to a matter that is related to the bankruptcy case, but statutorily and constitutionally non-core. Pursuant to 28 U.S.C. § 157(c)(1), the Court will therefore enter proposed findings of fact and conclusions of law to the District Court.

(2)  Southern Tier's Motion to Dismiss [ECF No. 11] is GRANTED as to Count 1 for failure to state a claim upon which relief may be granted under Civil Rule 12(b)(6) and DENIED as to Counts 2-11.

(3) Southern Tier's requests for permissive abstention or change of venue in its Motion to Dismiss [ECF No. 11] are DENIED.

(4) Southern Tier's Motion to Stay Proceeding [ECF No. 16] is DENIED.

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
***Gregory R. Schaaf***
**Bankruptcy Judge**
**Dated: Tuesday, March 16, 2021**
**(grs)**